1

2

3

4

5

6

7

8           UNITED STATES DISTRICT COURT

9           CENTRAL DISTRICT OF CALIFORNIA

10

11  RAMON RODRIGUEZ,                    )  Case No. CV 13-4904-SP
                                        )
12              Plaintiff,              )
                                        )
13          v.                          )  MEMORANDUM OPINION AND
                                        )  ORDER
14                                      )
    CAROLYN W. COLVIN, Acting           )
15  Commissioner of Social Security     )
    Administration,                     )
16                                      )
                Defendant.              )
17  _____ )

18                              **I.**

19                       **INTRODUCTION**

20          On July 23, 2013, plaintiff Ramon Rodriguez filed a complaint against the

21  Commissioner of the Social Security Administration ("Commissioner"), seeking a

22  review of a denial of a period of disability, disability insurance benefits ("DIB"),

23  and supplemental security income ("SSI").  Both plaintiff and defendant have

24  consented to proceed for all purposes before the assigned Magistrate Judge

25  pursuant to 28 U.S.C. § 636(c).  The court deems the matter suitable for

26  adjudication without oral argument.

27          Plaintiff presents four disputed issues for decision:  (1) whether the

28

                                  1

administrative law judge ("ALJ") properly rejected the opinion of the treating physician; (2) whether the ALJ properly discounted plaintiff's credibility; (3) whether the ALJ properly assessed plaintiff's residual functional capacity ("RFC"); and (4) whether the testimony of the vocational expert constituted substantial evidence and conflicted with the Dictionary of Occupational Titles ("DOT").  Memorandum in Support of Plaintiff's Complaint ("P. Mem.") at 2-9; Defendant's Memorandum in Support of Defendant's Answer and in Opposition to Plaintiff's Memorandum in Support of Plaintiff's Complaint ("D. Mem.") at 3-10.

Having carefully studied, inter alia, the parties' written submissions, the Administrative Record ("AR"), and the decision of the ALJ, the court concludes that, as detailed herein, the ALJ properly rejected the opinion of the treating physician, properly discounted plaintiff's credibility, and reached a proper RFC determination.  Although the court finds that the ALJ's decision contains a conflict concerning plaintiff's language abilities, the error was harmless.  Consequently, this court affirms the decision of the Commissioner denying benefits.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff, who was 47 years old on his alleged disability onset date, has a third-grade education.  AR at 36, 144, 150.  He has past relevant work as a framer. *Id.* at 53.

On September 8, 2011 and September 30, 2011, plaintiff filed applications for a period of disability, DIB, and SSI, alleging an onset date of June 1, 2007, due to diabetes, pain, swelling, bleeding, numbness and persistent infection, loss of toe, high blood pressure, and poor vision. *Id.* at 144-51, 163, 167, 180.  The Commissioner denied plaintiff's application initially, after which he filed a request for a hearing. *Id.*  66-70, 72.

1      On January 14, 2013, plaintiff, represented by counsel, appeared and

2   testified before the ALJ. *Id.* at 33-63.  Aida Washington, a vocational expert

3   ("VE"), also provided testimony. *Id.* at 52-62.  On February 22, 2013, the ALJ

4   denied plaintiff's claim for benefits. *Id.* at 17-28.

5      Applying the well-known five-step sequential evaluation process, the ALJ

6   found, at step one, that plaintiff had not engaged in substantial gainful activity

7   since June 1, 2007, the alleged onset date. *Id*. at 19.

8      At step two, the ALJ found that plaintiff suffered from the following severe

9   impairments:  partial amputation of the left big toe due to osteomyelitis; diabetic

10  peripheral neuropathy; significant reduced vision in the left eye; obesity; and a

11  history of diabetic foot ulcerations. *Id.*

12     At step three, the ALJ found that plaintiff's impairments, whether

13  individually or in combination, did not meet or medically equal one of the listed

14  impairments set forth in 20 C.F.R. part 404, Subpart P, Appendix 1 (the

15  "Listings"). *Id.* at 20.

16     The ALJ then assessed plaintiff's RFC,[1] and determined that he had the

17  RFC to perform medium work with the following limitations:  exert twenty to fifty

18  pounds of force occasionally, up to ten to twenty pounds of force frequently, and

19  greater than negligible up to ten pounds of force constantly to move objects;

20  stand/walk up to six hours and sit up to six hours in an eight-hour day with normal

21  breaks; no climbing ladders, ropes, or scaffolds; no more than occasional

22  balancing or crawling; no more than frequent climbing of ramps or stairs,

23

24  _____

25  [1]   Residual functional capacity is what a claimant can do despite existing
    exertional and nonexertional limitations. *Cooper v. Sullivan*, 880 F.2d 1152,
26  1155-56 n.5-7 (9th Cir. 1989).  "Between steps three and four of the five-step
    evaluation, the ALJ must proceed to an intermediate step in which the ALJ
27  assesses the claimant's residual functional capacity." *Massachi v. Astrue*, 486
28  F.3d 1149, 1151 n.2 (9th Cir. 2007).

1  stooping, kneeling, or crouching; frequent pushing, pulling, and handling of

2  objects with upper extremities; occasional operation of foot controls with left

3  lower extremity and frequent operation of foot controls with right lower extremity;

4  and no more than frequent or concentrated exposure to hazardous machinery,

5  unprotected heights, or other high risk, hazardous or unsafe conditions. *Id*. The

6  ALJ also noted that plaintiff had a limited ability to communicate in English;

7  could do work that did not require fine distant vision; could read large print; could

8  work with large objects; and could avoid ordinary hazards in the workplace. *Id.*

9     The ALJ found, at step four, that plaintiff was unable to perform his past

10  relevant work as a framer. *Id*. at 26.

11     At step five, the ALJ determined that, based upon plaintiff's age, education,

12  work experience, and RFC, plaintiff could perform other jobs "that exist in

13  significant numbers in the national economy," including laborer in stores, linen

14  room attendant, and hand packager. *Id.* at 26-27. The ALJ specifically noted that

15  plaintiff could perform the identified jobs even if his RFC was further restricted by

16  the ability to see out of only one eye. *Id*. at 27. Consequently, the ALJ

17  determined that plaintiff did not suffer from a disability as defined under the

18  Social Security Act. *Id*. at 28.

19     Plaintiff filed a timely request for review of the ALJ's decision, which was

20  denied by the Appeals Council. *Id.* at 1-3, 9. The ALJ's decision stands as the

21  final decision of the Commissioner.

## III.

## STANDARD OF REVIEW

24     This court is empowered to review decisions by the Commissioner to deny

25  benefits. 42 U.S.C. § 405(g). The findings and decision of the Social Security

26  Administration must be upheld if they are free of legal error and supported by

27  substantial evidence. *Mayes v. Massanari*, 276 F.3d 453, 458-59 (9th Cir. 2001)

28

1  (as amended).  But if the court determines that the ALJ's findings are based on

2  legal error or are not supported by substantial evidence in the record, the court

3  may reject the findings and set aside the decision to deny benefits.  *Aukland v.*

4  *Massanari*, 257 F.3d 1033, 1035 (9th Cir. 2001); *Tonapetyan v. Halter*, 242 F.3d

5  1144, 1147 (9th Cir. 2001).

6          "Substantial evidence is more than a mere scintilla, but less than a

7  preponderance."  *Aukland*, 257 F.3d at 1035.  Substantial evidence is such

8  "relevant evidence which a reasonable person might accept as adequate to support

9  a conclusion."  *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998); *Mayes*, 276

10  F.3d at 459.  To determine whether substantial evidence supports the ALJ's

11  finding, the reviewing court must review the administrative record as a whole,

12  "weighing both the evidence that supports and the evidence that detracts from the

13  ALJ's conclusion."  *Mayes*, 276 F.3d at 459.  The ALJ's decision "'cannot be

14  affirmed simply by isolating a specific quantum of supporting evidence.'"

15  *Aukland*, 257 F.3d at 1035 (quoting *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th

16  Cir. 1998)).  If the evidence can reasonably support either affirming or reversing

17  the ALJ's decision, the reviewing court "'may not substitute its judgment for that

18  of the ALJ.'"  *Id.* (quoting *Matney v. Sullivan*, 981 F.2d 1016, 1018 (9th Cir.

19  1992)).

20                                        **IV.**

21                                 **DISCUSSION**

22  **A.     The ALJ Cited Specific and Legitimate Reasons for Rejecting the**

23          **Opinion of the Treating Physician**

24          Plaintiff argues that the ALJ improperly rejected the opinion of his treating

25  physician, Dr. Shahida Baig.  P. Mem. at 2-3.  Specifically, plaintiff contends that

26  the reasons the ALJ provided for rejecting Dr. Baig's opinion were not specific

27  and legitimate.  *Id.*

28

1    In determining whether a claimant has a medically determinable

2  impairment, among the evidence the ALJ considers is medical evidence.  20

3  C.F.R. §§ 404.1527(b), 416.927(b).  In evaluating medical opinions, the

4  regulations distinguish among three types of physicians:  (1) treating physicians;

5  (2) examining physicians; and (3) non-examining physicians.  20 C.F.R.

6  §§ 404.1527(c), (e), 416.927(c), (e); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir.

7  1996) (as amended).  "Generally, a treating physician's opinion carries more

8  weight than an examining physician's, and an examining physician's opinion

9  carries more weight than a reviewing physician's."  *Holohan v. Massanari*, 246

10  F.3d 1195, 1202 (9th Cir. 2001); 20 C.F.R. §§ 404.1527(c)(1)-(2), 416.927(c)(1)-

11  (2).  The opinion of the treating physician is generally given the greatest weight

12  because the treating physician is employed to cure and has a greater opportunity to

13  understand and observe a claimant.  *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th

14  Cir. 1996); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

15    Nevertheless, the ALJ is not bound by the opinion of the treating physician.

16  *Smolen*, 80 F.3d at 1285.  If a treating physician's opinion is uncontradicted, the

17  ALJ must provide clear and convincing reasons for giving it less weight.  *Lester*,

18  81 F.3d at 830.  If the treating physician's opinion is contradicted by other

19  opinions, the ALJ must provide specific and legitimate reasons supported by

20  substantial evidence for rejecting it.  *Id.* at 830.  Likewise, the ALJ must provide

21  specific and legitimate reasons supported by substantial evidence in rejecting the

22  contradicted opinions of examining physicians.  *Id.* at 830-31.  The opinion of a

23  non-examining physician, standing alone, cannot constitute substantial evidence.

24  *Widmark v. Barnhart*, 454 F.3d 1063, 1067 n.2 (9th Cir. 2006); *Morgan v.

25  Comm'r*, 169 F.3d 595, 602 (9th Cir. 1999); *see also Erickson v. Shalala*, 9 F.3d

26  813, 818 n.7 (9th Cir. 1993).

27    Dr. Baig, a family practitioner at St. John's Well Child and Family Center

28

1   ("St. John's Center"), reported that she treated plaintiff for eight months.  AR at

2   367.  On November 13, 2012, Dr. Baig completed a Diabetes Mellitus RFC

3   Questionnaire.  *Id.* at 367-72.  Dr. Baig diagnosed plaintiff with diabetes, diabetic

4   neuropathy, prostrate hypertrophy, and peripheral vascular disease.[2]  Dr. Baig

5   opined that plaintiff had the RFC to sit/stand thirty minutes at a time for about four

6   hours a day and lift/carry twenty pounds frequently.  *Id.* at 369-71.   In addition,

7   plaintiff must walk every thirty minutes for ten minutes each time, required at least

8   two unscheduled breaks, had to have his legs elevated to 45 degrees when sitting

9   for a prolonged period of time, and could not bend or twist.  *Id*.  Dr. Baig also

10   opined that plaintiff had depression and his symptoms interfered with his attention

11   and concentration.  *Id*. at 368.

12       Here, the ALJ gave Dr. Baig's opinion little weight because:  (1) there was

13   no evidence that Dr. Baig treated plaintiff on more than one occasion; (2) her

14   opinion was inconsistent with her treatment notes; and (3) her opinion was

15   inconsistent with the objective medical evidence.  *Id*. at 25.

16       The first reason the ALJ provided for rejecting Dr. Baig's opinion – the

17   record contains evidence suggesting that Dr. Baig only treated plaintiff on one

18   occasion – is not a specific and legitimate reason for rejecting her opinion, but is a

19   factor that can be considered in how much weight to give Dr. Baig's opinion.  The

20   record only contains treatment notes from Dr. Baig for one day, September 25,

21   2012.[3]  *See id*. at 332-43.  Normally, a treating physician's opinion is given the

22   greatest weight.  *Smolen*, 80 F.3d at 1285.  But here, although plaintiff may have

23

24

25     [2]   It is unclear whether Dr. Baig diagnosed plaintiff with peripheral vascular
disease or simply had not ruled it out.  In the opinion, there appears to be a

26 question mark following "peripheral vascular disease."  AR at 367.

27     [3]   The notes indicate that Dr. Baig ordered several tests, which were reported

28 to her on September 25 and 26, 2012.  AR at 332-37.

1  seen Dr. Baig for purposes of treatment, functionally Dr. Baig was more similar to

2  a consulting physician.  As such, the ALJ need not give Dr. Baig's opinion greater

3  weight.  Nonetheless, the same analysis applies as if Dr. Baig were a consulting

4  physician.  The fact that Dr. Baig may have only treated plaintiff on one occasion

5  does not suffice as a reason to reject her opinion.  Thus, the ALJ must still provide

6  specific and legitimate reasons for rejecting Dr. Baig's opinion.

7        The second reason the ALJ cited – Dr. Baig's progress notes do not support

8  her opinion – is specific and legitimate and supported by substantial evidence.  *See*

9  *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (finding that an ALJ

10  may reject a treating physician's opinion if it is unsupported by his treatment notes

11  and clinical findings).  Other than diminished sensation in both feet, Dr. Baig's

12  notes do not contain any notes or tests that would support the physical restrictions

13  she opined.  *Id.* at 340.  Dr. Baig's notes also do not support her opinions about

14  plaintiff's non-exertional limitations.  Dr. Baig opined that plaintiff had depression

15  and that the depression was affecting his pain and that his symptoms were severe

16  enough to "constantly" interfere with his attention and concentration.  *Id.* at 368.

17  But Dr. Baig's treatment notes contradict her opinion.  The treatments notes reflect

18  that plaintiff reported that he had no trouble "concentrating on things" and that his

19  moments of feeling down or depressed had not impacted his ability to do work or

20  take care of things.  *Id.* at 339.  Indeed, Dr. Baig categorized plaintiff's depression

21  as mild.  *Id.*

22        Even assuming that the other treatments notes from St. John's Center could

23  be considered Dr. Baig's treatment notes, those also do not support Dr. Baig's

24  opinion. On March 14, 2012, plaintiff stated that he had sharp back pain, but the

25  results of his examination were normal, including the finding that plaintiff had a

26  normal full range of motion of all joints in the extremities.  *Id*. at 361, 363.  On

27  April 19, 2012, plaintiff reported that he was not in pain and the results of his foot

28

1    exam were normal. *Id*. at 350, 352.  On July 18, 2012, plaintiff again reported that

2    he was not in pain. *Id*. at 347.  On August 10, 2012, plaintiff complained of pain

3    and numbness in both feet. *Id.* at 344.  The podiatrist treated plaintiff with vitamin

4    B12 injections and Neurontin, but did not order any physical restrictions. *Id*. at

5    346.  Moreover, plaintiff only reported that he was depressed and had trouble

6    concentrating at the April 2012 visit, but in earlier and subsequent visits he

7    reported that he was not depressed. *See id.* at 344, 348, 351, 362.  None of these

8    treatments notes reflect symptoms consistent with Dr. Baig's opined limitations.

9          Finally, the ALJ's finding that Dr. Baig's opinion was inconsistent with

10   other evidence in the record is supported by substantial evidence. *See*

11   *Magallanes*, 881 F.2d at 751-54 (inconsistency with the objective medical

12   evidence is a specific and legitimate reason for rejecting the opinion of a treating

13   physician).  In October 2009, plaintiff was diagnosed with diabetes mellitus. *Id*. at

14   222, 250.  In March 2011, plaintiff was admitted to hospital after experiencing

15   pain in his left toe due to diabetic ulceration with underlying osteomyelitis. *Id*. at

16   210.  As a result of the osteomyelitis, the physicians conducted a partial

17   amputation of the distal phalanx in his big toe on the left foot. *Id.*  Plaintiff was

18   not taking any diabetes medication at the time. *Id.*  On September 8, 2011,

19   plaintiff was experiencing fatigue and numbness in his feet after having not taken

20   medications for two months. *Id.* at 271.  The physicians provided general advice

21   about diabetes but did not impose any physical limitations. *See id.* at 277-78.  On

22   December 5, 2011, Dr. Soheila Benrazavi, a consultative physician, examined

23   plaintiff and found that plaintiff's diabetes was poorly controlled and there were

24   signs of diabetic peripheral neuropathy in the bilateral upper and lower extremities

25   with diminution in sensation, but that it was mild. *Id.* at 288.  Based on the fact

26   that the findings were otherwise normal, Dr. Benrazavi opined that plaintiff had no

27   exertional limitations. *Id.* at 289.  Plaintiff's medical records also indicate that he

28

9

1  had a steady gait and was ambulatory. *See, e.g., id.* at 288, 345, 380.  Taken as a

2  whole, the objective medical evidence did not support Dr. Baig's opinion.

3  Accordingly, plaintiff is not entitled to relief on this claim.  The ALJ cited

4  specific and legitimate reasons supported by substantial evidence for rejecting the

5  opinion of plaintiff's treating physician, Dr. Baig.

6  **B.**    **The ALJ Provided Clear and Convincing Reasons for Discounting**

7  **Plaintiff's Credibility**

8  Plaintiff contends that the ALJ improperly found him less credible.  P.

9  Mem. at 4-6.  Specifically, plaintiff argues that the ALJ's two reasons for

10  discounting his credibility were not clear and convincing and supported by

11  substantial evidence. *Id.*

12  The ALJ must make specific credibility findings, supported by the record.

13  Social Security Ruling ("SSR") 96-7p.[4]  To determine whether testimony

14  concerning symptoms is credible, the ALJ engages in a two-step analysis.

15  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007).  First, the ALJ

16  must determine whether a claimant produced objective medical evidence of an

17  underlying impairment "'which could reasonably be expected to produce the pain

18  or other symptoms alleged.'" *Id.* at 1036 (quoting *Bunnell v. Sullivan*, 947 F.2d

19  341, 344 (9th Cir. 1991) (en banc)).  Second, if there is no evidence of

20  malingering, an "ALJ can reject the claimant's testimony about the severity of her

21  symptoms only by offering specific, clear and convincing reasons for doing so."

22  *Smolen*, 80 F.3d at 1281; *Benton v. Barnhart*, 331 F.3d 1030, 1040 (9th Cir.

23

24  [4]  "The Commissioner issues Social Security Rulings to clarify the Act's
implementing regulations and the agency's policies.  SSRs are binding on all
25  components of the SSA.  SSRs do not have the force of law.  However, because
they represent the Commissioner's interpretation of the agency's regulations, we
26  give them some deference.  We will not defer to SSRs if they are inconsistent with
27  the statute or regulations." *Holohan v. Massanari*, 246 F.3d 1195, 1203 n.1 (9th
28  Cir. 2001) (internal citations omitted).

10

1  2003).  The ALJ may consider several factors in weighing a claimant's credibility,

2  including:  (1) ordinary techniques of credibility evaluation such as a claimant's

3  reputation for lying; (2) the failure to seek treatment or follow a prescribed course

4  of treatment; and (3) a claimant's daily activities.  *Tommasetti v. Astrue*, 533 F.3d

5  1035, 1039 (9th Cir. 2008); *Bunnell*, 947 F.2d at 346-47.

6       At the first step, the ALJ found that plaintiff's medically determinable

7  impairments could reasonably be expected to cause the symptoms alleged.  AR at

8  22.  At the second step, because the ALJ did not find any evidence of malingering,

9  the ALJ was required to provide clear and convincing reasons for discounting

10  plaintiff's credibility.   Here, the ALJ discounted plaintiff's credibility because:

11  (1) the objective clinical findings did not support the limitations; (2) plaintiff

12  failed to follow his treatment plan; and (3) his limitations were inconsistent with

13  his daily activities.  *Id*. at 22-24.

14       The first reason cited by the ALJ for discounting plaintiff's credibility – his

15  limitations are unsupported by the objective findings – is clear and convincing and

16  supported by substantial evidence.  As discussed *supra*, the objective medical

17  evidence reflects that plaintiff has diabetes and had a partial toe amputation.  *See*

18  *id.* at 210.  It also reflects that plaintiff has complained about foot pain and loss of

19  sensation in his feet on some occasions, *see id.* at 339, 344, but he also had normal

20  foot exams, did not continuously complain about foot pain, had a steady gait, and

21  was ambulatory, *see, e.g., id*. at 288, 345, 350, 352, 380.  In addition, aside from

22  one treating physician, whose opinion was properly rejected, no physician

23  imposed any exertional limitations on plaintiff.  Dr. Benrazavi, the examining

24  physician, found that plaintiff's examination was normal and also did not opine

25  any exertional limitations.  *See id.* at 284-89.

26

27

28                                         11

1    The second reason the ALJ provided for finding plaintiff less credible was

2    that plaintiff failed to follow his treatment plan. *Id.* at 22-23. The failure to

3    follow a treatment plan may be a clear and convincing reason for discounting a

4    claimant's credibility. *See Tommasetti*, 533 F.3d at 1039. Here, the record shows

5    that plaintiff was diagnosed with diabetes in October 2009. *See* AR at 222, 250.

6    After the initial diagnosis, there are no treatment records until March 2011, which

7    show that plaintiff was not taking any diabetes medications at the time. *See id.* at

8    210. In September 2011, plaintiff visited the Martin Luther King, Jr. Multi-

9    Service Ambulatory Care Center to request a refill of his diabetes medication,

10   which he had finished two months prior. *Id.* at 271. Plaintiff also requested a

11   referral to a primary clinic due to the fact that he lost his private insurance. *Id.* On

12   July 16, 2012, plaintiff visited the emergency department at the St. Francis

13   Medical Center to obtain a refill of his diabetes medication. *Id.* at 376, 380.

14   Plaintiff reported that his regular clinic could not schedule him until either the

15   next week or month. *Id.* Just two days later, plaintiff visited his clinic and a

16   family nurse practitioner noted that plaintiff's diabetes was uncontrolled and

17   updated his medication list. *Id.* at 349. In September 2012, a nutritionist at St.

18   John's Center reported that plaintiff was not checking his blood sugar levels

19   because he ran out of strips. *Id.* at 331.

20       It is undisputed that prior to March 2011 plaintiff was non-compliant with

21   his treatment plan. Since then, however, it appears that plaintiff has made an

22   effort to follow his plan. Although he ran out of medications on two occasions

23   and failed to check his blood sugar level, he did seek out refills, albeit in an

24   untimely fashion. Although the evidence of non-compliance is not strong, because

25   there is evidence to support the ALJ's reason, the court may not substitute its

26   judgment for the ALJ.

27

28                                          12

1    The ALJ's final reason for discounting plaintiff's credibility was his daily

2  activities. *Id.* at 24.  Specifically, the ALJ found that plaintiff's allegations were

3  inconsistent with his "somewhat normal level of daily activity and interaction,"

4  which as plaintiff testified included walking and moving around to music,

5  preparing his own meals, washing dishes, and helping with laundry and

6  housework. *Id*.  Inconsistency between a claimant's alleged symptoms and his

7  daily activities may be a clear and convincing reason to find a claimant less

8  credible. *Tommasetti*, 533 F.3d at 1039; *Bunnell*, 947 F.2d at 346-47.  But "the

9  mere fact a [claimant] has carried on certain daily activities, such as grocery

10 shopping, driving a car, or limited walking for exercise, does not in any way

11 detract from her credibility as to her overall disability." *Vertigan v. Halter*, 260

12 F.3d 1044, 1050 (9th Cir. 2001).  A claimant does not need to be "utterly

13 incapacitated." *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).  If, however, a

14 claimant is "able to spend a substantial part of his day engaged in pursuits

15 involving the performance of physical functions that are transferable to a

16 work setting, a specific finding as to this fact may be sufficient to discredit" him.

17 *Id.*

18    Here,  plaintiff's symptoms were not inconsistent with his alleged symptoms

19 and the ALJ misconstrued plaintiff's testimony.  The ALJ simplified plaintiff's

20 responses.  When provided the opportunity to further describe his daily activities,

21 plaintiff explained that his walking and moving around to music consisted of

22 walking around the block once a day and then "just moving from one side to the

23 other" to music about ten minutes a day.  AR at 45-46.  Regarding his meal

24 preparation, plaintiff testified that he only prepared simple dishes such as eggs and

25 beans. *Id.* at 45.  As for housework, plaintiff spent no more than five minutes

26 sweeping, did laundry about once a week, and washed the dishes once every four

27

28                                              13

1   or five days for about ten minutes.  *Id*. at 47-48.  These activities did not indicate

2   that plaintiff could spend a substantial part of his day performing physical

3   functions that were transferable to work setting.

4         Accordingly, plaintiff's daily activities were not a clear and convincing

5   reason supported by substantial evidence to discount plaintiff's credibility.

6   Nonetheless, the other two reasons – lack of objective medicine and failure to

7   adhere to a treatment plan – were sufficient, and thus the ALJ did not err in

8   discounting plaintiff's credibility.

9   **C.    The ALJ's RFC Determination Regarding Plaintiff's Visual Limitations**

10        **Was Supported by Substantial Evidence**

11        Plaintiff argue that the visual limitations in his RFC are unsupported by the

12  record.  P. Mem. at 6-7.  Specifically, plaintiff contends that the ALJ improperly

13  rejected Dr. Benrazavi's opinion that plaintiff could not perform work requiring

14  binocular vision and intact depth perception due to cataracts.  *Id*.  Plaintiff alleges

15  that the ALJ failed to retain a medical expert to examine plaintiff's post-operative

16  ophthalmology records and simply interpreted them himself.  *Id*.

17        At the December 5, 2011 examination, Dr. Benrazavi observed that

18  plaintiff's left eye had cataracts.  AR at 288-89.  Although Dr. Benrazavi noted

19  that plaintiff could move about the clinic without difficulty, she opined that due to

20  his poor vision, which may be correctable, "occupations and activities that require

21  binocular vision or intact depth perception [were] limited."  *Id.* at 288-89.

22        From February 2012 through August 2012, physicians at Harbor UCLA

23  Medical Center treated plaintiff's eyes.  *See id*. at 394-412.  At the initial exam in

24  February, plaintiff was unable to see the chart out of his left eye.  *Id*. at 409.  In

25  July, the physicians diagnosed plaintiff with choroideremia in the left eye and

26  proliferative diabetic retinopathy ("PDR") in both eyes.  *Id*. at 397, 405, 408.  On

27

28                                          14

1  August 2, 2012, plaintiff had cataract surgery in the left eye. *Id.* at 400-01.  On

2  August 31, 2012, plaintiff had pan-retinal photocoagulation performed on both

3  eyes to treat his PDR. *Id.* at 395.  The physician observed that plaintiff had 20/100

4  vision in the right eye and 20/60 in the left eye, and with pin hole correction,

5  plaintiff had 20/60 and 20/40 vision respectively. *Id*. at 394.

6       Here, the ALJ did not reject Dr. Benrazavi's opinion.  She opined that

7  plaintiff's cataracts "may be amenable" to surgery and that his work abilities

8  would be limited without surgery. *Id*. at 289.  After Dr. Benrazavi rendered her

9  opinion, plaintiff had cataract surgery and pan-retinal photocoagulation and his

10  vision indeed improved. *Compare id.* at 394, 409.  Thus, the ALJ's determination

11  that plaintiff's vision had improved sufficiently such that he could see out of his

12  left eye after cataract surgery was not a rejection of Dr. Benrazavi's opinion. *See*

13  *id.* at 23-24.

14       Plaintiff also contends that the ALJ improperly focused on plaintiff's

15  pinhole corrected visual acuity and that he should not have interpreted plaintiff's

16  medical records without the aid of a medical expert. P. Mem. at 6.  Whether it was

17  proper for the ALJ to consider plaintiff's pinhole corrected vision is not

18  dispositive.  Plaintiff's medical records reflect that his vision, without pinhole

19  correction, improved to 20/100 in the right eye and 20/60 in the left eye. AR at

20  394.  The ALJ did not need a physician to review the records simply to reiterate

21  what it plainly states, that plaintiff could see out of his left eye after cataract

22  surgery.[5]

23

24

_____

25      [5]   Moreover, as discussed *infra*, any error would have been harmless as the VE

26  also testified that there were jobs plaintiff could perform even with vision in only

27  one eye. *See* AR at 58-59.

28                                15

1  Accordingly, the ALJ did not err when he determined that plaintiff was

2  limited to work that did not require fine distant vision but that he was able to read

3  large print, work with large objects, and avoid ordinary hazards in the workplace.

4  *Id.* at 20.  The ALJ's RFC determination was proper and supported by substantial

5  evidence.

6  **D.     The ALJ's Decision Contained a Conflict Regarding Plaintiff's**

7          **Language Ability,  But the Conflict Was Harmless**

8  Plaintiff argues that the vocational testimony did not constitute substantial

9  evidence to support the ALJ's step five finding that he could perform other work.

10 P. Mem. at 7-9.  Specifically, plaintiff contends that:  (1) the ALJ found that he was

11 unable to communicate in English and illiterate, but posed to the VE a hypothetical

12 person who had a limited ability to communicate in English; and (2) plaintiff's

13 visual limitations conflicted with two of the jobs cited by the VE.  *Id.* at 7-9.

14 At step five, the burden shifts to the Commissioner to show that the claimant

15 retains the ability to perform other gainful activity.  *Lounsburry v. Barnhart*, 468

16 F.3d 1111, 1114 (9th Cir. 2006) (as amended).  To support a finding that a claimant

17 is not disabled at step five, the Commissioner must provide evidence demonstrating

18 that other work exists in significant numbers in the national economy that the

19 claimant can perform, given his or her age, education, work experience, and RFC.

20 20 C.F.R. §§ 404.1520(g), 416.912(g).

21 ALJs routinely rely on the DOT "in evaluating whether the claimant is able

22 to perform other work in the national economy." *Terry v. Sullivan*, 903 F.2d 1273,

23 1276 (9th Cir. 1990) (citations omitted); *see also* 20 C.F.R. §§ 404.1566(d)(1),

24 416.966(d)(1) (DOT is source of reliable job information).  The DOT is the

25 rebuttable presumptive authority on job classifications.  *Johnson v. Shalala*, 60

26 F.3d 1428, 1435 (9th Cir. 1995).  An ALJ may not rely on a VE's testimony

27

28                              16

1    regarding the requirements of a particular job without first inquiring whether the

2    testimony conflicts with the DOT, and if so, the reasons therefor.  *Massachi*, 486

3    F.3d at 1152-53(citing SSR 00-4p).   But failure to so inquire can be deemed

4    harmless error where there is no apparent conflict or the VE provides sufficient

5    support to justify deviation from the DOT.  *Id.* at 1154 n.19.   In order for an ALJ

6    to accept a VE's testimony that contradicts the DOT, the record must contain

7    "'persuasive evidence to support the deviation.'"  *Id.* at 1153 (quoting *Johnson*, 60

8    F.3d at 1435).  Evidence sufficient to permit such a deviation may be either specific

9    findings of fact regarding the claimant's residual functionality, or inferences drawn

10   from the context of the expert's testimony.  *Light v. Soc. Sec. Admin.*, 119 F.3d

11   789, 793 (9th Cir. 1997) (as amended) (citations omitted).

12         At the hearing, the ALJ posed a hypothetical to the VE encompassing the

13   limitations provided in his RFC determination, including the limited ability to

14   communicate in English and work that would not require fine distant visual acuity.

15   AR at 54-55.  In response to the ALJ's hypothetical, the VE testified that plaintiff

16   could perform the jobs of laborer, stores (DOT No. 922.687-058), linen room

17   attendant (DOT No. 222.387-030) and hand packager (DOT No. 920.587-018).  *Id.*

18   at 55-56.  Subsequently, the ALJ posed a modified hypothetical in which the

19   person had the same limitations except that he could frequently handle objects with

20   the hand or left upper extremity and could only see with one eye.  *Id*. at 56-59.  The

21   VE testified such hypothetical person would still be able to perform the three jobs

22   identified.  *Id.* at 59.

23         Here, the ALJ erred in his decision with respect to plaintiff's ability to

24   communicate in English.  In the RFC determination, the ALJ stated that plaintiff

25   had a limited ability to communicate in English.  AR at 20.  Later in the decision,

26   the ALJ stated that plaintiff was "not able to communicate in English" and was

27

28                                                    17

illiterate.[6]  *Id.* at 26.  The ALJ's finding that plaintiff was unable to communicate in English appears to be a typographical error because his and plaintiff's other statements suggest that plaintiff had a limited ability to understand English. During the hearing, plaintiff testified that he could understand some but could not write English.  *Id.*  at 37.  The ALJ also presented the VE with a hypothetical person with a limited ability to communicate in English.  *Id.* at 55.

Nevertheless, if the ALJ meant to find that plaintiff was unable to communicate in English at all, then the hypothetical posed to the VE was incomplete.  *See Magallanes*, 881 F.2d at 756-57 (hypothetical must include all the limitations the ALJ found credible).  Such error would be harmless, however, because plaintiff acknowledges that the VE identified two jobs – laborer, store and hand packager – that do not require any ability to communicate in English. Plaintiff argues that his language limitations conflicted with the DOT only with respect to the job of linen room attendant.[7]

---

[6]   Literacy and the ability to communicate in English are two separate abilities.  "Illiteracy means the inability read or write."  20 C.F.R. §§ 404.1564(b)(1), 416.964(b)(1).  Communication includes speaking, reading, and understanding.  20 C.F.R. §§ 404.1564(b)(5), 416.964(b)(5).  Thus, a claimant may be illiterate but still able to communicate in English.

[7]   Each DOT job description includes GED scales for reasoning, language, and mathematics, which are "aspects of education (formal and informal) which are required of the worker for satisfactory job performance."  DOT, Appendix C, Section III.  To determine the language skills required, one should look to the language development level ratings for the job listed in the DOT.  The DOT classifies a linen room attendant as language development level two.   The DOT defines language development two as, among other things, having a passive vocabulary of 5000-6000 words, being able to write complex and complete sentences, and to speak clearly with the proper tenses.  *Id.*

The jobs of laborer and hand packager are categorized as language

1    Finally, plaintiff argues that the ALJ erred because the VE's testimony that

2 plaintiff could perform the jobs of laborer and hand packager even if he had no

3 binocular vision and limited depth perception conflicted with the DOT.  P. Mem. at

4 8-9.  As discussed above, the ALJ's RFC determination was proper and plaintiff

5 did not have limitations with respect to binocular vision and depth perception.  But

6 even assuming the ALJ should have found that plaintiff had such limitations, there

7 was no error.  The ALJ posed a hypothetical to the VE with such limitations and

8 the VE testified that a person who had no binocular vision could still perform the

9 jobs of store laborer, linen room attendant, and hand packager.  AR at 59.  Contrary

10 to plaintiff's argument, this testimony was not in conflict with the DOT

11 descriptions of the jobs.

12    Accordingly, the ALJ erred when he found that plaintiff both had a limited

13 ability to communicate in English and was not able to communicate in English, but

14 such error was harmless.  The VE testimony that plaintiff could perform the jobs of

15 store laborer and hand packager did not conflict with the DOT and therefore

16 constituted substantial evidence to support the ALJ's step five finding.

17

18

19

20

21 development level one.  Language development level one requires, inter alia, the
ability to recognize the meaning of 2,500 words and print simple sentences.  DOT,

22 Appendix C, Section III.  The VE did not explain this conflict.  *See Pinto v.*

23 *Massanari*, 249 F.3d 840, 847 (9th Cir. 2001) (finding that the ALJ must explain
the deviation between the DOT job description's language development level and

24 the claimant's literacy limitations).  But plaintiff does not argue that there was a

25 conflict between the VE testimony that he could perform the jobs of laborer and
hand packager and the DOT with regard to language ability and thus, the argument

26 is waived.  *See Greger v. Barnhart*, 464 F.3d 968, 973 (9th Cir. 2006) (arguments

27 not raised before the District Court are generally waived).

28                                        19

**V.**

**<u>CONCLUSION</u>**

IT IS THEREFORE ORDERED that Judgment shall be entered
AFFIRMING the decision of the Commissioner denying benefits, and dismissing
the complaint with prejudice.

DATED:  May 20, 2014

_____
SHERI PYM
United States Magistrate Judge

20